UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EAST SIDE CONVENIENT MARKET
LLC,

              Plaintiff,

v.

PAYARC LLC,

              Defendant.
                                           /

Case No. 2:21-cv-10368

HONORABLE STEPHEN J. MURPHY, III

**OPINION AND ORDER**
**DENYING PLAINTIFF'S SUMMARY JUDGMENT MOTION [28]**
**AND GRANTING DEFENDANT'S SUMMARY JUDGMENT MOTION [27]**

Plaintiff East Side Convenient Market filed a seven-claim amended complaint against Defendant PayArc. ECF 16. East Side's primary claims were for breach of contract and declaratory relief. *Id.* at 150–51, 160–61. East Side alternatively alleged that PayArc was liable under the Uniform Commercial Code ("U.C.C.") and the common law replevin, conversion, unjust enrichment, disgorgement, constructive trust, and resulting trust doctrines. *Id.* at 151–58. East Side and PayArc cross-moved for summary judgment on all claims. ECF 27; 28.

Both East Side and PayArc believe that the contractual provisions at issue in the litigation are clear and unambiguous. *See* ECF 27, PgID 485–91 (PayArc's summary judgment motion); ECF 31, PgID 669 (East Side's response to PayArc's summary judgment motion). The Court agrees. But each party reads the contract's plain language differently. *See generally* ECF 27; 31.

1

Both readings are flawed. But despite an unsound understanding of the contract, PayArc still complied with the contract's terms. And the rest of East Side's claims are inapplicable to the facts of the case. The Court will therefore grant PayArc's motion and deny East Side's.[1]

## BACKGROUND

East Side is a check-cashing and card-processing store located in Detroit, Michigan. ECF 28-1, PgID 565. In late August 2020, East Side contracted with PayArc for the provision of credit card processing services. *Id.* The duration of the contract was three years. ECF 27-2, PgID 501. But a mere fifteen days after the parties signed the agreement, PayArc sent East Side a termination notice. ECF 27-5, PgID 524.

A few days before termination, an agent that connected East Side and PayArc informed PayArc that he had serious concerns about the legitimacy of East Side's recent transactions. ECF 27-3, PgID 507–09 (email from agent). The agent believed that the volume of transactions increased exponentially at the same time Michigan-issued unemployment insurance debit cards were becoming widely held by East Side's clientele. *Id.* at 508. And the agent had heard that unemployment insurance fraud was rampant in Michigan at the time.[2] *Id.* at 509.

---

[1] Based on the parties' briefing, the Court will resolve the motions on the briefs without a hearing. *See* Fed R. Civ. P. 78(b); E.D. Mich. L.R. 7.1(f)(2).

[2] The agent had also heard a rumor that unemployment insurance fraud schemes in Michigan could be traced to a crime syndicate made up mostly of Lebanese Americans. ECF 27-3, PgID 509. The agent mistakenly believed that East Side's owner, William Munaco, was Lebanese American when he is in fact Italian American. *Id.* In the agent's email to PayArc, he relied on his mistaken assumption regarding

2

According to the agent, East Side's transactions were especially suspicious for two more reasons. First, customers could withdraw funds from the debit cards at any ATM or bank for either no fee or a negligible fee, but East Side charged the kind of fees typically associated with check-cashing stores. *Id.* at 508–09. The high volume of people withdrawing from the cards at East Side did not make economic sense. *Id.* Second, the amount of money withdrawn at East Side a month before the contract was signed was so high, and the average transaction amount was so low, that the number of transactions each week seemed unworkable. *Id.* at 509.

Besides the agent's concerns, PayArc's computerized system flagged the East Side transactions as "irregular or unusual processing activities." ECF 27-4, PgID 517. Individual transactions were not flagged as potentially fraudulent. *See id.* Instead, the transactions were flagged as suspicious *in the aggregate. Id.* The system flagged the transactions for three reasons: first, "the speed with which [the] transactions were processed, each lasting less than one minute"; second, "the volume of transactions processed ($2.7 million in the first two days) as compared to the monthly limit ($10 million) contained in the [contract]"; and third, "the fact that transactions were being processed early in the day with long gaps [] thereafter." *Id.*

After a brief five-day investigation into the flagged transactions, *id.*, PayArc terminated the contract with East Side, ECF 27-5, PgID 524. At the time of termination, PayArc had yet to disburse $1,285,240 to East Side from recent

---

Mr. Munaco's ethnicity to support his conclusion that East Side's transactions were fraudulent. *Id.*

3

transactions. ECF 28-1, PgID 566. Since termination, PayArc has refused to disburse the funds until the conclusion of a federal government investigation into whether East Side's transactions were fraudulent. ECF 27, PgID 483. East Side later sued PayArc for disbursement of the held funds. ECF 1; 16.

The parties' disagreement centers on two provisions in the contract. Section 5.1 states that "[PayArc] may upon reasonable grounds suspend disbursement of [East Side]'s funds for any reasonable period of time required to investigate suspicious or unusual deposit activity." ECF 27-2, PgID 503. And Section 4.4 provides that "[i]f this Agreement is terminated, regardless of cause, [PayArc] may withhold and discontinue the disbursement for all Cards and other [East Side] Transactions in the process of being collected and deposited." *Id.* at 502. Under Section 4.4, if the contract is terminated, there is no requirement that PayArc disburse withheld funds within a 'reasonable period of time.' *See id.* The parties dispute whether the two provisions allow PayArc to withhold disbursement of the funds pending the outcome of the federal government's investigation. *Compare* ECF 27, *with* ECF 28.

## LEGAL STANDARD

The Court must grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party must identify specific portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met that burden, the non-moving party may not simply rest on the

4

pleadings; instead, they must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted) (quoting Fed. R. Civ. P. 56(e)).

A fact is material if proof of that fact would establish or refute an essential element of the cause of action or a defense. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences "in the light most favorable to the non-moving party." *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987) (citations omitted).

## DISCUSSION

East Side's breach of contract and declaratory relief claims both focus on the parties' rights under the contract. ECF 16, PgID 150–51, 158–59. The Court can therefore conduct a single analysis to resolve the summary judgment motions on both claims. The Court will discuss the U.C.C. claim and the common law claims separately.

For choice of law, the contract stated that "Tennessee law governs this Agreement." ECF 27-2, PgID 504. Neither party disputed that Tennessee law applies to all claims at issue, so the Court will apply it across the board.

I. <u>Breach of Contract and Declaratory Relief Claims</u>

Tennessee courts tasked with interpreting a contract must "ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language." *Teter v. Republic Parking Sys., Inc.*, 181 S.W.3d 330, 342 (Tenn. 2005) (quotation omitted). The inquiry is simple: "If a contract's language is clear and unambiguous, then the literal meaning of the language controls the outcome of the contract dispute." *Id.* (citation omitted). When possible, Tennessee courts also strive to construe all provisions of a contract in harmony with one another "to promote consistency and to avoid repugnancy between the various provisions of a single contract." *Id.* (quotation omitted).

Here, the contract permitted PayArc to withhold the funds at issue. Five days passed between when PayArc started to investigate the suspicious pattern of East Side's transactions and the day PayArc sent East Side the termination notice. *Compare* ECF 27-3, PgID 507, *with* ECF 27-5, PgID 524. The investigation began because PayArc's computerized system flagged East Side's transactions as, in the aggregate, "unusual" in light of their speed, volume, and timing. ECF 27-4, PgID 517.

Section 5.1 of the contract allowed PayArc to suspend disbursement of East Side's funds if PayArc had reasonable grounds to investigate "suspicious or unusual deposit activity." ECF 27-2, PgID 503. The contractual language also mandated a reasonable investigatory period. *Id.* When the computerized system flagged East Side's transactions as "unusual," ECF 27-4, PgID 517, that flag provided PayArc with reasonable grounds to suspend disbursement of funds and launch an investigation.

6

PayArc's investigation into the unusual transactions culminated, just five days later, in termination of the contract. ECF 27-5, PgID 524. East Side did not argue that a five-day investigatory period was unreasonable; instead, East Side maintained that an indefinite investigatory period was unreasonable. *See generally* ECF 28; 31; 32. But an indefinite investigatory period is not an accurate characterization of PayArc's conduct so long as the termination was proper. If PayArc properly terminated the contract, Section 5.1 would no longer govern the withholding of funds; Section 4.4 would.

And under Section 4.4, PayArc, upon termination, could withhold disbursement of any funds in the process of being collected and deposited. ECF 27-2, PgID 502. Unfortunately, the parties did not define the phrase 'collected and deposited.' But another provision of the contract used both terms: "[PayArc] will accept from [East Side] all Sales Drafts *deposited* by [East Side] under the terms of this Agreement and will present the same to the appropriate Card Issuers for *collection* against Cardholder accounts." ECF 27-2, PgID 500 (emphases added). "Collected" clearly connotes PayArc's ability to take the amount charged in a transaction from an East Side customer's account. *Id.* "Deposited," on the other hand, is trickier to define. In Section 4.4, the phrase containing "deposited" relates to "transactions." *Id.* at 502. In another part of the contract that discussed the term "deposited" and which is excerpted above, the phrase relates to "sales drafts." *Id.* at 500. A "transaction" is defined as a sale made by East Side "for which the [purchaser] makes payment through the use of any Card and which is presented to [their bank]

7

for collection." *Id.* at 496. A "sales draft" is defined as a document that evidences a transaction. *Id.*

Section 4.4 would have used the term "sales draft" to refer to East Side's 'deposit' of a document evidencing a transaction before "collection." And "deposited" would have come before "collected" in the sentence like in the earlier section to signify that "deposit" is a prerequisite to "collection." The use of the term "transaction" instead of "sales draft" and the placement of "deposited" after "collected" suggests that "deposited" is central to the process of "disbursing" the "collected" funds into East Side's "deposit account," a term defined elsewhere in the contract as the account that PayArc credits and debits. *Id.* at 504. In other words, "the process of being . . . deposited," *id.* at 502, ends once the funds are disbursed into the deposit account.

Because the funds at issue were never 'deposited,' Section 4.4 would permit PayArc to withhold them. And because Section 4.4 does not have a 'reasonable period of time' limitation, the lengthy period that PayArc has withheld the funds would not breach the contract.

But whether Section 4.4 or Section 5.1 governs depends on whether PayArc properly terminated the contract. The contract provides for termination both with and without cause. *Id.* at 501. To properly terminate the contract without cause, PayArc simply had to provide "30 days advance written notice to [East Side]." *Id.* To properly terminate the contract with cause, PayArc had to "reasonabl[y] determine[]" that East Side "violated any provision of" the contract, that East Side was "involved

8

in processing transactions arising from fraudulent or otherwise unauthorized transactions," or that East Side was "unable . . . to perform its obligations under" the contract. *Id.* at 501–02.

PayArc argued that because East Side had reached nearly forty percent of the monthly transactions cap within a few days of the signing of the contract, East Side breached the agreement. ECF 30, PgID 652–53. East Side did not breach the contract by quickly approaching the cap, but the pace of transactions did justify PayArc terminating the contract for cause.

While the contract did not mention weekly or daily transactions caps, *see generally* ECF 27-2, PayArc could have *reasonably determined* that East Side would exceed the monthly cap because there was no sign that East Side's transactions were slowing and the total amount would have far exceeded the cap at the early pace of transactions. And a *reasonable determination* that East Side would be unable to perform an obligation under the contract was all that PayArc needed to terminate the contract for cause. *Id.* at 501–02.

On top of that, PayArc could *reasonably determine* that East Side had engaged in fraudulent transactions, a proper reason for terminating the contract. *Id.* PayArc's computerized system flagged the transactions as suspicious because of their speed, volume, and timing. ECF 27-4, PgID 517. The system flagging East Side's transactions as unusual and suspicious allowed PayArc to *reasonably determine* that East Side was engaged in fraudulent transactions. PayArc's for-cause termination

9

was therefore proper, and Section 4.4 governed the continued withholding of the funds.

But even if PayArc did not properly terminate the contract for cause, there was a proper "without cause" termination. PayArc sent East Side the termination notice on September 9, 2020. ECF 27-5, PgID 524. Since East Side received the termination notice the same day, if the notice was not for a proper with cause termination then the notice served as the "advanced written notice to [East Side]" required to start the thirty-day clock for termination without cause. ECF 27-2, PgID 501. The without-cause termination would have become effective on October 9, 2020.

The thirty-five days between the start of PayArc's investigation and the without cause termination date would have been governed by Section 5.1. East Side has pointed to no authority that would frown upon a thirty-five-day investigatory period as unreasonable, and the time period appears to be objectively reasonable on its face. Section 4.4 would govern the time since October 9, 2020.

In sum, PayArc either properly terminated the contract with cause or properly terminated the contract without cause. The period before termination was governed by Section 5.1. And that was a reasonable investigatory period under the contract, regardless of whether it was a five- or thirty-five-day period. The period since termination is governed by Section 4.4 of the contract. Because there is no reasonable period of time requirement on the withholding of funds under Section 4.4, and because PayArc could withhold any funds not yet disbursed, the continued withholding of funds does not breach the contract.

II. <u>U.C.C. Claim</u>

East Side's second claim in the amended complaint had to do with whether the contract was a letter of credit under the U.C.C. as codified in Tennessee law. ECF 16, PgID 156–57. East Side alleged that PayArc violated both Article 5 and Revised Article 9. *Id.* (citing Tenn. Code Ann. §§ 47-5-101 and 47-9-101); *see also* ECF 28, PgID 553 ("[T]he Agreement was bound by Articles 5 and 9 of the [U.C.C.]").

East Side argued that because PayArc was an "issuer" and the contract was a letter of credit, PayArc could only withhold the funds for ninety days under section 47-9-620(f). ECF 16, PgID 156–57; ECF 28, PgID 552–53. But even if the contract was a letter of credit, section 47-9-620(f) would not govern PayArc's conduct. After all, subsection (f) governs disposition of collateral under subsection (e), which deals with the "mandatory disposition of consumer goods." *See generally* U.C.C. Rev. § 9-620(e), (f). And "'[c]onsumer goods' means goods that are used or bought for use primarily for personal, family, or household purposes." Tenn. Code Ann. § 47-9-102(a)(23); *see generally* U.C.C. Rev. § 9-102(a)(23). The funds at issue are plainly not 'consumer goods,' so section 47-9-620(f) does not apply.

Regardless, the definition of "letter of credit" in Article 5 precludes the term from applying to the parties' contract. A "[l]etter of credit" is "a definite undertaking that satisfies the requirements of section 47-5-104 by an issuer to a beneficiary at the request or for the account of an applicant or, in the case of a financial institution, to itself or for its own account, to honor a documentary presentation by payment or delivery of an item of value." Tenn. Code Ann. § 47-5-102(a)(10); *see generally* U.C.C.

11

§ 5-102(a)(10). An "issuer" is "a bank or other person that issues a letter of credit, but does not include an individual who makes an engagement for personal, family, or household purposes." Tenn. Code Ann. § 47-5-102(a)(9); *see generally* U.C.C. § 5-102(a)(9). And a "beneficiary" is "a person who under the terms of a letter of credit is entitled to have its complying presentation honored." Tenn. Code Ann. § 47-5-102(a)(3); *see generally* U.C.C. § 5-102(a)(3).

Simply put, the contract is not a letter of credit because East Side is not a beneficiary entitled to some form of payment upon presentation of the contract to PayArc. Upon signing, East Side was entitled to only the parties' mutual obligations to fulfill the terms of the contract once transactions started. The Court will therefore grant PayArc and deny East Side summary judgment on the U.C.C. claim.

III. <u>Replevin and Conversion Claims</u>

Plaintiff conceded that replevin and conversion differ only in their remedies, so an analysis under Tennessee conversion case law disposes of the replevin claim as well. ECF 28, PgID 553. Conversion involves "the appropriation of the thing to the party's own use and benefit, by the exercise of dominion over it, in defiance of the plaintiff's rights." *Kinnard v. Shoney's, Inc.*, 100 F. Supp. 2d 781, 797 (M.D. Tenn. 2000) (quotation omitted). Because PayArc had a contractual right to withhold the funds, PayArc has never exercised dominion over the funds in a manner that defies East Side's rights. As a result, the Court will grant PayArc and deny East Side summary judgment on both the replevin and conversion claims.

12

IV. <u>Unjust Enrichment and Disgorgement</u>

Like most States, Tennessee's unjust enrichment case law requires proof of three elements: first, "a benefit conferred upon the defendant by the plaintiff"; second, "appreciation by the defendant of such benefit"; and third, "acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (quotation and alterations omitted). But "[t]he most significant requirement of an unjust enrichment claim is that the benefit to the defendant be unjust." *Id.* (citations omitted).

Here, there has been no conferral of an unjust benefit because PayArc may withhold the funds under the contract. The Court must therefore grant summary judgment to PayArc on the unjust enrichment and disgorgement claims and deny East Side summary judgment.

V. <u>Resulting and Constructive Trust Claims</u>

Resulting and constructive trusts are equitable remedies. *Story v. Lanier*, 166 S.W.3d 167, 184 (Tenn. Ct. App. 2004). In general, Tennessee courts will use the resulting trust remedy when:

> [O]ne person becomes invested with a legal title but is obligated in equity to hold his legal title for the benefit of another, the intention of the former to hold in trust for the latter being implied or presumed as a matter of law, although no intention to create or hold in trust has been manifested, expressly or by inference, and there ordinarily being no fraud or constructive fraud involved.

*Id.* (quoting *In re Est. of Nichols*, 856 S.W.2d 397, 401 (Tenn. 1993)).

Typically, resulting trusts are created when an express trust fails or a court fashions an equitable remedy to prevent a "failure of justice." *Id.* (quoting *Nichols*, 856 S.W.2d at 401). Neither scenario occurred here, so the Court will grant PayArc and deny East Side summary judgment on the resulting trust claim.

A constructive trust is created under four circumstances: first, "where a person procures the legal title to property in violation of some duty, express or implied, to the true owner"; second, "where the title to property is obtained by fraud, duress[,] or other inequitable means"; third, "where a person makes use of some relation of influence or confidence to obtain the legal title upon more advantageous terms than could otherwise have been obtained"; and fourth, "where a person acquires property with notice that another is entitled to its benefits." *Id.* at 185 (quoting *Myers v. Myers*, 891 S.W.2d 216, 219 (Tenn. Ct. App. 1994)). Because PayArc could withhold the funds under the contract, none of the four circumstances apply here. The Court will therefore grant summary judgment to PayArc on the constructive trust claim and deny East Side's motion on the claim.

## CONCLUSION

There are no genuine issues of material fact involved in the analysis of any of East Side's claims. And as a matter of law, the Court must rule in PayArc's favor on those claims. The Court will therefore grant PayArc's motion for summary judgment and deny East Side's motion for summary judgment. This is a final order that dismisses all of East Side's claims and closes the case.

While the motions for summary judgment were pending, East Side moved to place into escrow the funds in dispute. ECF 39. Because the Court will grant PayArc's motion for summary judgment and dismiss East Side's claims, the Court will deny the motion for escrow as moot.

## ORDER

**WHEREFORE**, it is hereby **ORDERED** that Plaintiff's motion for summary judgment [28] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's motion for summary judgment [27] is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's motion to escrow [39] is **DENIED AS MOOT**.

This is a final order that closes the case.

**SO ORDERED.**

s/ Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: August 16, 2022

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 16, 2022, by electronic and/or ordinary mail.

s/ David P. Parker
Case Manager
